<u>NOT FOR PUBLICATION</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| TRACI J. SULTAN | HON. JEROME B. SIMANDLE |
| Plaintiff, | Civil No. 03-5190 (JBS) |
| v. |  |
| LINCOLN NATIONAL CORPORATION, <u>et al.</u>, | **OPINION** |
| Defendants. |  |

APPEARANCES:

Mark E. Belland, Esq.
Nancy S. Sokol, Esq.
O'BRIEN, BELLAND & BUSHINSKY, LLC
2111 New Road, Suite 101
Northfield, NJ 08225
    Attorneys for Plaintiff

Stephanie J. Cohen, Esq.
B. John Pendleton, Jr., Esq.
McCARTER & ENGLISH, LLP
100 Mulberry Street
Newark, NJ 07102
    Attorneys for Defendants Lincoln National Corporation,
    Lincoln National Corporation Employees Retirement Plan, and
    The Lincoln National Corporation Employees Severance Pay
    Plan

**SIMANDLE**, District Judge:

    This motion is before the Court upon Defendants Lincoln

National Corporation, Lincoln National Corporation Employees

Retirement Plan and The Lincoln National Corporation Employees

Severance Plan's motion for summary judgment.  Plaintiff Traci

J. Sultan brings this action claiming breach of her employment

contract, a violation of the New Jersey Law Against
Discrimination and a violation of the Employee Retirement Income
Security Act ("ERISA").  Plaintiff's claims stem from her
termination in June of 2002.  Plaintiff alleges she was
terminated because she had hepatitis C.

This Court will grant Defendants' motion for summary
judgment as to the four counts included in Plaintiff's Complaint.
Because Plaintiff failed to exhaust Defendants' internal
administrative grievance and appeals process for claims denied
under Defendants' retirement and severance plans, Plaintiff
cannot maintain this action under ERISA, 29 U.S.C. § 1132(a).  In
addition, no genuine issues of material fact exist relating to
Plaintiff's breach of contract claim.  Even if the Letter of
Agreement between Plaintiff and her supervisor constituted an
employment contract (as Plaintiff alleges), the Letter of
Agreement contains no term that can overcome the presumption
under New Jersey law that an employee is an employee-at-will and
can be terminated for no reason or any reason.  Because
Defendants' action of terminating Plaintiff would not breach the
Letter of Agreement, Plaintiff cannot maintain a breach of
contract claim.  Finally, this Court holds that Plaintiff's claim
under the NJLAD is preempted by ERISA and must be dismissed.  The
Court's Opinion is set forth below.

I. BACKGROUND

   A.   **Plaintiff's Employment at Lincoln National Corporation**

      Plaintiff Traci J. Sultan (the "Plaintiff") was employed as an assistant at Lincoln National Corporation from October 19, 1998 until June 18, 2002.  (Defendants' Statement of Material Facts Not in Dispute ("Def.'s Statement") ¶ 1.)  Plaintiff served as the clerical assistant to Michael Byrne ("Byrne"), a Lincoln registered representative who provides retirement planning, investment advice and life insurance policies to high net worth individuals.  (Id. ¶ 1-2.)  Plaintiff's duties included compiling reports on clients' holdings and accounts, serving as a liaison between Byrne and his clients and, because she had a Series 7 license, placing trades on behalf of Byrne's clients. (Plaintiff's Statement of Undisputed Material Facts (Pl.'s Statement") ¶ 1; Def.'s Statement  ¶ 4.)  According to her deposition, when Plaintiff was hired, she was a full-time employee without a contract.  (Deposition of Traci Sultan at 38.)

      In 1999, Plaintiff became pregnant and requested to change her schedule from full to part-time upon her return from maternity leave.  (Def.'s Statement ¶ 5.)  Due to complication with her pregnancy, Plaintiff took disability/maternity leave from December 1, 1999 though April, 2000.  (Id.)  While Plaintiff was on leave, Beverly Mitchell ("Mitchell") took over Plaintiff's job responsibilities and, when Plaintiff returned in

3

April 2000, Plaintiff and Mitchell devised a schedule pursuant to which each would work part-time for Byrne.  (<u>Id</u>. ¶ 6.)

### B. <u>Plaintiff's Benefits</u>

As an employee of Lincoln National Corporation, Plaintiff was eligible to participate in several benefits plans. Specifically, Plaintiff was entitled to and did participate in Defendants' Severance Pay Plan (the "Severance Plan"). (Pendleton Aff. Ex. C and D.)  Under the Severance Plan, an employee who was terminated due to job elimination or office closing would receive a severance payment of between one week and one year's pay depending on their length of service with the company.  (<u>Id</u>.)  An employee employed for between three and four years would be entitled to five weeks severance, for example. (<u>Id</u>.)  It was Defendants' policy that, in order to qualify for severance pay, the employee must, among other things, "sign a company-approved agreement, waiver and general release, waiving all claims against the company."  (<u>Id</u>. at Ex. D.)

Plaintiff was also entitled to participate in Defendants' Employees' Retirement Plan (the "Retirement Plan").  (<u>Id</u>. at Ex. E.)  Under the Retirement Plan, an employee would be entitled to a certain percentage of her salary in pension distributions upon reaching a certain age and having a certain number of years with the Company.  (<u>Id</u>.)  An employee "vests" in the Plan for that

calendar year after the employee works a certain number of hours within that year.  (<u>Id</u>.)

Finally, as a part-time employee with greater than three months of continuous active employment, Plaintiff was eligible for Defendants' Employees' Short Term Disability Plan (the "STD Plan.") (Pendleton Aff. Ex. F.)  The STD Plan paid employees for a number of weeks worth of pay if they were disabled and unable to perform their job duties.  (<u>Id</u>.)  As with the Severance Plan and the Retirement Plan, the STD Plan sets out an internal administrative procedure wherein a claimant "shall not be entitled to challenge the LNC Benefits Appeal and Operations Committee's determination...without first filing a written request for review and otherwise complying with the claim procedures."  (<u>Id</u>.)

C. **The Letter of Agreement**

After Mitchell and Plaintiff had decided on their part-time work schedules, Plaintiff, Mitchell and Byrne memorialized the arrangement in a document titled "Letter of Agreement" on April 10, 2000.  (<u>Id</u>. ¶ 8; Pl.'s Statement ¶ 4-5.)  The Letter Agreement recited the current situation between the two assistants, set out each woman's work schedule, and stated that "[e]ach employee would be considered hourly and, as such, would not be eligible for benefits (medical, dental, disability)" but

5

would be eligible to contribute to [Defendants'] 401k plan and earn paid-time-off."  (Complaint, Ex. A.)

The Letter of Agreement also stated that the parties would "initiate a 6-month trial period following the schedule outlined" and if Byrne is unhappy with the arrangement at any time, "the arrangement will be terminated and both [Plaintiff] and [Mitchell] will submit their resignations."  (Id.)  Finally, the Letter of Agreement stated that "[i]f it is determined to have been a successful trial period, it will become the regular work arrangement."  (Id.)  The letter did not state either Plaintiff's or Mitchell's hourly wage, contain the term of Plaintiff's employment, or state that Plaintiff or Mitchell could only be terminated for "just cause" or upon certain notice from Byrne.[1] (Id.)

The parties dispute the legal significance of the Letter of Agreement.  Defendants state that it was understood by all parties that the Letter of Agreement was "simply a written summary of the schedule change."  (Def.'s Statement ¶ 11; Sultan Dep. at 52.)  In contrast, Plaintiff considered the Letter of Agreement to be an employment contract.  Plaintiff states that she inquired with Byrne during the six-month time frame regarding

---

[1]  Note that Defendants' employee handbook (titled "Lincoln Financial Advisors/Sagemark Consulting Associate Handbook") provides that all employees "may be terminated by the associate of the company at any time."

6

his satisfaction with the arrangement and Byrne reported that the arrangement was "great" and that he had no complaints.  (Pl.'s Statement ¶ 9.)

   D.   **Events of 2000-2002**

   Between 2000 and early 2002, Byrne hired two new employees to accommodate what he considered an increased workflow.  (Sultan Dep. at 73.)  In 2000, Byrne hired Frank Wildman ("Wildman"), a licensed investment broker as Byrne's full-time assistant.  (Id. at 73-74.)  Next, in February of 2002, Byrne hired Kelly Zanto Fox ("Fox") as a full-time systems operator.  (Pl.'s Statement ¶ 16; Def.'s Statement 15.)   Throughout 2002, according to Byrne, his business became more specialized with Mitchell handling insurance matters, Fox serving as the client liaison, processing the investment business and managing the client database and Wildman handling investments.  (Deposition Transcript of Michael Byrne at 45-46.)  Byrne concluded that Sultan's position was no longer needed and should be eliminated.  (Byrne Dep. Tr. at 45.)

   Several weeks before Byrne states that he considered eliminating Plaintiff's position, on April 30, 2002, Plaintiff informed Byrne that she had contracted hepatitis C.  (Def.'s Statement ¶ 19-20; Pl.'s Statement ¶ 20-25.)  According to Plaintiff, Byrne "repeatedly questioned [her] every other day or every couple of days what the status" of her disease was, "what she found out, how sick she was, and what type of treatment she

7

needed." (Pl.'s Statement ¶ 30.)  On June 13, 2002, Ms. Sultan
returned from gallbladder surgery and informed Sandra Fincher
(the MidAtlantic Regional Director of Operations) ("Fincher")
that she had been diagnosed with hepatitis C.  (Pl.'s Statement
31.)  According to Plaintiff, on June 16, 2002, she was
terminated.  (Id. ¶ 32.)   Defendants argue that Plaintiff was
told that Byrne "needed to cut some costs" and her position was
being eliminated and that she would be eligible for benefits
under Defendants' Severance Plan.  (Def.'s Statement ¶ 25-26).

During the termination meeting, Fincher reminded Plaintiff
that she must sign an agreement, waiver and general release (the
"Release") to be eligible to receive severance pay under the
Severance Plan.  Specifically, Fincher told Plaintiff that in
order get the severance pay, Plaintiff "will need to sign this
form and [Fincher] will be calculating within the next day the -
your vacation time that [sic.] owed to you." (Sultan Dep. Tr. at
113.)  Plaintiff stated that she wanted to have her husband
review the Release prior to signing.  (Id.) Plaintiff never
signed the release or returned it to Defendants.  (Id.)[2]

What occurred next was a series of correspondence between
Plaintiff, her counsel and Defendants.  Specifically, after a

---

[2]  Plaintiff testified that she did not sign the release
because Defendants did not have "just cause" for terminating her
and that her termination was the result of her hepatitis.
(Sultan Depo. Tr. at 124.)

telephone conversation between Fincher and Plaintiff regarding Plaintiff's eligibility for severance pay and retirement benefits, Plaintiff (and her counsel) and Defendants exchanged a number of letters:

- An undated letter from Defendants to Plaintiff, in which Philip Johnson, (Defendants' Regional Human Resources "generalist") (1) attached an explanation of Defendants' Retirement Plan and a table explaining distribution schedule of Defendants' Severance Plan, (2) provided Plaintiff with a toll-free number for a service called "HRDirect" if she had questions about her benefits and (3) provide an explanation that it was not Defendants' policy to "extend short-term disability or long-term disability benefits coverage after termination of employment."  (Declaration of Nancy S. Sokol, Ex. F.);

- A July 1, 2002 letter from Plaintiff to Michael Byrne (1) requesting copies of Defendants' Retirement Plan "by-laws" and "statements showing all contributions made on [Plaintiff's] behalf;" (2) a counter-proposal regarding Defendants' severance package; (3) a statement that she is "convinced that my termination has to do with a totally different issue than the one given to me;" and (4) a statement that, if Plaintiff's counterproposal is accepted, she will sign the Release;

- A September 26, 2002 letter from Mark Belland, Esq. (counsel for Plaintiff) requesting (1) a copy of the Severance Plan; (2) a copy of Defendants' "Employee's Savings & Profit Sharing Plan" with Plaintiff's accrued benefits; (3) a statement of Plaintiff's accrued benefits under the Retirement Plan; and (4) a copy of Plaintiff's "employment agreement;"

- An October 15, 2002 letter from Russell Strunk (Senior Counsel for Defendants) to Belland enclosing: (1) a copy of the Severance Plan and 1998 amendment and (2) a copy of Defendants' "Employee's Savings & Profit Sharing Plan" and amendments.  Strunk also stated that, because Plaintiff did not have five years of service with Defendants, she was "not vested" in the Retirement Plan (but could call a toll-free number if she had questions regarding her eligibility). Strunk also included a copy of the "Letter of Agreement"

signed by Plaintiff, Byrne and Beverly Mitchell (and denied
that it was an employment agreement.);

- A December 10, 2002 letter from Belland to Strunk
  acknowledging receipt of "documentation concerning
  [Plaintiff's] employment" and indicating that "significant
  issues" exist concerning the actions of Defendants,
  including allegations of breach of contract and violation of
  the NJLAD.  Belland also asked that Defendants advise
  whether Defendants' Employees' Savings & Profit Sharing Plan
  is a 401k Plan and asks for the amount in the account;

- A January 6, 2003 letter from Strunk to Belland asking for
  clarification of Plaintiff's theories and causes of action
  so that he could "be in position to discuss this matter"
  with Defendants; and

- A February 5, 2003 letter from Belland to Strunk elaborating
  on Plaintiff's claims of breach of contract and violation of
  NJLAD and requesting Plaintiff's lost wages and benefits.
  Belland also again requests that Defendants advise whether
  Defendants' Employees' Savings & Profit Sharing Plan is a
  401k Plan and again asks for the amount in the account.

(Id.)  Plaintiff certified that Defendants did not reply to her

attorney's February 5, 2003 letter.  (Sokol Cert. ¶ 13.)

   **E.   Procedural History**

   Plaintiff initiated this action against the Defendants on

September 15, 2003, in the Superior Court of New Jersey, Law

Division (Gloucester County), New Jersey.  On October 31, 2003,

Defendants removed this action to this Court.  [Docket Item No.

1.]  Plaintiff's Complaint contains claims of (1) breach of

Plaintiff's employment contract (Count One), (2) violation of the

New Jersey Law Against Discrimination (the "NJLAD")(Count Two);

and (3) claims under ERISA, 29 U.S.C. § 1132(a)(1)(B), for a

determination of the benefits owed to Plaintiff under the

10

Defendants' Pension Plan (Count Three) and Severance Plan (Count Four).

Defendants answered Plaintiff's Complaint on November 21, 2003. [Docket Item No. 6.]  Defendants filed a motion for summary judgment. [Docket Item No. 15.]  Plaintiff filed opposition [Docket Item No. 20], to which Defendants replied.  [Docket Item No. 21.]  The Court did not hear oral argument on the motion. See Fed. R. Civ. P. 78.

## III. SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[3]  Fed. R. Civ. P. 56(c).  In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The threshold inquiry is

---

[3] A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  See id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  See id.

11

whether there are "any genuine factual issues that properly can
be resolved only by a finder of fact because they may reasonably
be resolved in favor of either party."[4] <u>Liberty Lobby</u>, 477 U.S.
at 250; <u>Brewer v. Quaker State Oil Ref. Corp.</u>, 72 F.3d 326, 329-
30 (3d Cir. 1995) (citation omitted).

## III. DISCUSSION

Defendants move for summary judgment as to all four Counts
in Plaintiff's Complaint.  Defendants first argue that
Plaintiff's claims with respect to Defendants' Severance Plan and
Retirement Plan must be dismissed because, as required under
ERISA, Plaintiff has failed to exhaust her administrative
remedies or demonstrate that exhaustion of such administrative
remedies would be futile (Part III.A, <u>infra</u>).  Second, Defendants
contend that Plaintiff never had an employment agreement with
Defendants and, as such, cannot bring a breach of contract claim
based on her termination (Part III.B, <u>infra</u>).   Finally,
Defendants argue that summary judgment is appropriate with
respect to Plaintiff's claims under the NJLAD because (i)
Plaintiff's NJLAD claim is preempted by ERISA, or in the
alternative, (ii) Plaintiff's NJLAD claim is without merit as

---

[4] The moving party always bears the initial burden of
showing that no genuine issue of material fact exists, regardless
of which party ultimately would have the burden of persuasion at
trial.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986);
<u>Country Floors v. Partnership of Gepner and Ford</u>, 930 F.2d 1056,
1061-63 (3d Cir. 1991).

Plaintiff cannot demonstrate the essential elements of a hostile work environment claim (Part III.C, <u>infra</u>).  The Court will discuss each argument below.

**A.   <u>Plaintiff's Claims under Defendants' Severance Plan and Retirement Plan</u>**

In Count Three of her Complaint, Plaintiff seeks a declaratory ruling determining her status as a participant in the Retirement Plan.  (Compl. ¶ 19.)  In Count Four of her Complaint, Plaintiff seeks damages for "benefits due" under Defendants' Severance Plan.  (Compl. ¶ 24.)  The issue before the Court is whether Plaintiff exhausted her administrative remedies as a claimant is required to do under ERISA and both the Severance and Retirement Plans.

Plaintiff does not dispute that both the Severance Plan and the Retirement Plan are ERISA plans.  The Severance Plan is an "employee welfare benefit plan" as that term is defined under ERISA, 29 U.S.C. § 1002(1).[5]  Similarly, the Retirement Plan is

---

[5]   An "employee welfare benefit plan" is defined as:

> [A]ny plan, fund, or program which was heretofore or is
> hereafter established or maintained by an employer...to
> the extent that such plan, fund, or program was
> established or is maintained for the purpose of
> providing for its participants or their beneficiaries,
> through the purchase of insurance or otherwise, (A)
> medical, surgical, or hospital care or benefits, or
> benefits in the event of sickness, accident,
> disability, death or unemployment....

29 U.S.C. § 1002(2)(B)(i).

an "employee pension benefit plan" as that term is defined under ERISA, 29 U.S.C. § 1002(2)(A).[6]  A beneficiary of an ERISA plan may bring a civil action to recover benefits due to her under the plan, to enforce her rights under the terms of the plan or to clarify her rights to future benefits under the terms of the plan.  See 29 U.S.C. § 1132(a)(1)(B).  "Except in limited circumstances...a federal court will not entertain an ERISA claim unless the plaintiff has exhausted the remedies available under the [ERISA] plan." Weldon v. Kraft, Inc., 896 F.2d 793, 800 (3d Cir. 1990).  Courts require exhaustion of administrative remedies "'to help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide for a non-adversarial method of claim settlement; and to minimize the costs of settlement for all concerned.'" Harrow v. Prudential Ins. Co. of Am., 279 F.3d 244, 249 (3d Cir. 2002)(quoting Amato v. Bernard, 618 F.2d 559, 567 (9th Cir. 1980)).

A plaintiff, however, may be excused from exhausting administrative procedures under ERISA if the plaintiff can prove

_____

[6]  An "employee pension benefit plan" is defined as:

Any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, the extent that...(i) provides retirement income to employees.

29 U.S.C. § 1002(2)(A).

14

that doing so would be futile.  See Berger v. Edgewater Steel
Co., 911 F.2d 911, 916 (3d Cir. 1990); see also Harrow, 279 F.3d
at 249.  A plaintiff's situation merits waiver of the exhaustion
requirement if the plaintiff makes a "clear and positive showing
of futility."  Harrow, 279 F.3d at 249 (quoting Brown v. Cont'l
Baking Co., 891 F. Supp. 238, 241 (E.D. Pa. 1995)); see D'Amico
v. CBS Corp., 297 F.3d 287 (3d Cir. 2002).  Factors the Court
must weigh when considering whether to excuse exhaustion on
futility grounds include: (1) whether plaintiff diligently
pursued administrative relief; (2) whether plaintiff acted
reasonably in seeking immediate judicial review under the
circumstances; (3) the existence of a fixed policy with the
defendant-company denying benefits; (4) failure of the company to
comply with its own internal administrative procedures; and (5)
testimony of plan administrators that any administrative appeal
was futile.  See Berger, 911 F.2d at 916-17.  "Of course, all
factors may not weigh equally."  Harrow, 279 F.3d at 250.

### 1.    Exhaustion of Administrative Remedies

Defendants argue that Plaintiff has failed to exhaust her
administrative remedies prior to bringing this suit.  (Def.'s Br.
at 14.)  Specifically, Defendants contend that (1) both the
Severance Plan and the Retirement Plan identify the internal
review procedures for filing a claim for benefits and appealing a
denied claim and that (2) Plaintiff failed to comply with these

procedures (and in fact, in her deposition testimony, Plaintiff

concedes as much).  (Id.)  Plaintiff, in contrast, argues that,

based upon "the numerous requests and repeated denials [of

benefits], it is obvious that Plaintiff has...exhausted her

administrative remedies" or "at the very least, shown substantial

compliance."  (Pl.'s Opp. Br. at 24.)  Plaintiff cites the

numerous letters sent by her and by her counsel to

representatives of Defendants.  (Id.)

     Both Defendants' Severance Plan and Retirement Plan contain

language specifying the internal grievance policy for each plan.

Specifically, Defendants' Retirement Plan states, under the

section captioned "Denial of a Claim for Benefits" that:

> All persons making a claim shall be notified in writing
> whether or not the claim will be paid...within ninety
> (90) days of receipt by the Plan Administrator or its
> delegate of a properly filed claim.  If any part of the
> claim is denied, the notice will explain the specific
> reason(s) for the denial and will include reference to
> the Plan provision(s) upon which the denial was based.

(Retirement Plan, Pendleton Aff. ¶ 6, Ex. E.)  If the claimant's

initial claim is denied, the claimant is:

> entitled to...(1) request a review of the decision, (2)
> review pertinent documents used in the claim
> determination, and (3) submit any issues and comments
> in writing.  To request a review, the claimant must
> file a written request with the LNC Benefits Appeals
> and Operations Committee within sixty (60) days of
> receiving the original claim determination.

(Id.)  Defendants' Severance Plan, as amended, contains similar

language to that of the Retirement Plan, stating that if a claim

is denied, "[t]he employee may appeal the decision to the LNC
Benefits Appeals and Operations Committee...[through] a written
request...within 60 days of...denial." (Severance Pay Policy §§
5.01-5.03, Pendleton Aff. ¶ 4., Ex. C.)  The LNC Benefits Appeals
and Operations Committee is then required to make a decision
within sixty (60) days after the LNC Benefits Appeals and
Operations Committee's receives the request for appeal. (Id.)
All decisions of the LNC Benefits Appeals and Operations
Committee are final. (Id.)  Finally, the Severance Plan and
Retirement Plan each state that:

> Claimants shall not be entitled to challenge the LNC
> Benefits Appeals and Operations Committee's
> determination in judicial or administrative proceedings
> without first filing the written request for review and
> otherwise complying with the claim procedure.

(Id.; Def.'s Statement ¶¶ 32, 33 and 40.)

This Court agrees with Defendants that Plaintiff has failed
to exhaust her administrative remedies prior to bringing this
action.  First, it is not clear from the evidence presented that
Plaintiff took the initial step in the claims procedure by filing
a claim for benefits.  Plaintiff did testify that, after her
termination, she contacted someone from human resources but
admits that she never filled out any paperwork asking for her
benefits or called the toll-free number provided by Defendants
for answers to her benefits questions.  What is more clear,
however, is that Plaintiff did not take the second step in the

claims procedure - appealing any denial of benefits in writing to the LNC Benefits Appeals and Operations Committee.  The Court also disagrees that the series of letters she and her counsel sent to Defendants constituted unambiguous requests for benefits. The record indicates approximately ten communications between Plaintiff and Defendants.  The first communication was in the form of a telephone conversation soon after Plaintiff's termination, between Plaintiff and Sandra Fincher.  (Sultan Dep. Tr. at 135-36.)  Plaintiff asked Fincher about how she should go about obtaining her severance and retirement benefits.  (Id. at 136.)  Plaintiff testified that Fincher told Plaintiff that she was not entitled to her retirement benefit because Plaintiff was not "vested."  (Id.)  After the telephone conversation with Fincher, Plaintiff (and her counsel) and representative of Defendants exchanged a number of letters including:

- An undated letter from Defendants to Plaintiff, in which Philip Johnson, (Defendants' Regional Human Resources "generalist") (1) attached an explanation of Defendants' Retirement Plan and a table explaining distribution schedule of Defendants' Severance Plan, (2) provided Plaintiff with a toll-free number for a service called "HRDirect" if she had questions about her benefits and (3) provided an explanation that it was not Defendants' policy to "extend short-term disability or long-term disability benefits coverage after termination of employment."  (Declaration of Nancy S. Sokol, Ex. F.)

- A July 1, 2002 letter from Plaintiff to Michael Byrne (1) requesting copies of Defendants' Retirement Plan "by-laws" and "statements showing all contributions made on [Plaintiff's] behalf;" (2) a counter-proposal regarding Defendants' severance package; (3) a statement that she is "convinced that my termination has to do with a totally

18

different issue than the one given to me;" and (4) a statement that, if Plaintiff's counterproposal is accepted, she will sign the Release;

- A September 26, 2002 letter from Mark Belland, Esq. (counsel for Plaintiff) requesting (1) a copy of the Severance Plan; (2) a copy of Defendants' "Employee's Savings & Profit Sharing Plan" with Plaintiff's accrued benefits; (3) a statement of Plaintiff's accrued benefits under the Retirement Plan; and (4) a copy of Plaintiff's "employment agreement;"

- An October 15, 2002 letter from Russell Strunk (Senior Counsel for Defendants) to Belland enclosing: (1) a copy of the Severance Plan and 1998 amendment and (2) a copy of Defendants' "Employee's Savings & Profit Sharing Plan" and amendments. Strunk also stated that, because Plaintiff did not have five years of service with Defendants, she was "not vested" in the Retirement Plan (but could call a toll-free number if she had questions regarding her eligibility). Strunk also included a copy of the "Letter of Agreement" signed by Plaintiff, Byrne and Beverly Mitchell (and denied that it was an employment agreement.);

- A December 10, 2002 letter from Belland to Strunk acknowledging receipt of "documentation concerning [Plaintiff's] employment" and indicating that "significant issues" exist concerning the actions of Defendants, including allegations of breach of contract and violation of the NJLAD. Belland also asked that Defendants advise whether Defendants' Employees' Savings & Profit Sharing Plan is a 401k Plan and asks for the amount in the account;

- A January 6, 2003 letter from Strunk to Belland asking for clarification of Plaintiff's theories and causes of action so that he could "be in position to discuss this matter" with Defendants; and

- A February 5, 2003 letter from Belland to Strunk elaborating on Plaintiff's claims of breach of contract and violation of NJLAD and requesting Plaintiff's lost wages and benefits. Belland also again requests that Defendants advise whether Defendants' Employees' Savings & Profit Sharing Plan is a 401k Plan and again asks for the amount in the account.

(Id.) Plaintiff certified that Defendants did not reply to her

attorney's February 5, 2003 letter. (Sokol Cert. ¶ 13.)

19

Nowhere in any of the correspondence between Plaintiff and Defendants did Plaintiff make an unambiguous request for benefits or appeal to the LNC Benefits Appeals and Operations Committee. Rather than an unambiguous request, the letters simply evidence (1) Plaintiff's disappointment with being terminated; (2) an attempt to negotiate a better severance agreement for herself; (3) a request for documentation relating to the Severance Plan and Retirement Plan (which appear to have been provided to Plaintiff as attached to Defendants' October 15, 2002 letter); and (4) discussion regarding Plaintiff's potential claims against Defendants.[7]

Even if this Court were to view these letters as a request for benefits, none of Plaintiff's letters requests a review of Defendants' initial denial of benefits with the LNC Benefits Appeals and Operations Committee.  Both the Severance and Retirement Plans clearly state that, upon an initial denial of

---

[7]  This Court has carefully reviewed the correspondence between the parties and cannot conclude either (1) that Plaintiff exhausted administrative remedies or (2) that this Court should grant Defendants' motion for summary judgment without prejudice to Plaintiff's right to file a second suit if Plaintiff, within a certain number of days, exhausts the Plan's internal administrative procedures and Defendants thereafter continue to deny Plaintiff's request for benefits.  See Tomczyscyn v. Teamsters, Local 115 Health and Welfare Fund, 590 F. Supp. 211, 217 (E.D. Pa. 1984).  The Court could only conclude as much if Plaintiff had presented evidence of an unambiguous claim for benefits on her part followed by an incomplete or problematic response by Defendants.  Plaintiff, however, has failed to provide as much.

20

benefits, a claimant must request a review by filing a written

request with the LNC Benefits Appeals and Operations Committee.

(Pendleton Aff., Ex. C, D and E.)   In her deposition testimony,

Plaintiff admits that such a request was never made - stating

that, after her phone call with Fincher, Plaintiff never filled

out any paperwork requesting benefits from Defendants.   (Sultan

Dep. Tr. at 137.)   Moreover, Plaintiff failed to submit any

evidence that she called the toll-free numbers ("HRDirect")

provided by Defendants where Plaintiff could find additional

information about her benefits eligibility.   As such, this Court

holds that Plaintiff has failed to exhaust her administrative

remedies and therefore, cannot maintain an action under ERISA.[8]

---

[8]   Plaintiff argues that she has "at the very least, shown
substantial compliance" with Defendants' administrative remedies
procedure.   Even if substantial compliance" was the standard for
satisfying ERISA's requirement that a claimant exhaust her
administrative remedies, the Court disagrees that Plaintiff has
substantially complied.   Defendants' Severance Plan and
Retirement Plan did not contain complex and archaic
administrative review procedure.   In contrast, the plans simply
required that Plaintiff needed to make her claim (which could
have been easily accomplished by filing a written claim for
benefits), and, if dissatisfied, file an appeal before the LNC
Benefits Appeals and Operations Committee in writing within 60
days of being notified of a denial of her claim.

Moreover, the Court disagrees with Plaintiff's
characterization that her requests for "benefits and information
regarding her benefits" were "consistently and unequivocally"
denied.   (Pl.'s Opp. Br. at 24.)   The evidence in this case shows
that Defendants were responsive to Plaintiff's request for
information.   (Sokol Decl. Ex. F.)

## 2.  Whether Exhaustion of Administrative Remedies Would Be Futile

Plaintiff argues that this Court should waive the requirement that Plaintiff exhaust her administrative remedies because any further request for benefits would have been futile. (Sultan Aff. ¶ 11-15.)  Plaintiff argues that she "made diligent efforts to pursue [her] administrative relief" and "after no response to repeated requests for further information" from Plaintiff, she promptly sought judicial review.  (Pl.'s Opp. Br. at 24.)  Plaintiff continues, taking the position that Defendants (a) did not comply with their own internal administrative procedures by not responding to Plaintiff's requests for information and not providing a proper reason for Defendants denial of Plaintiff's benefits under the Plans and (b) "as a result of the numerous request and repeated denials, it was clear that [Defendants had] a fixed policy of denying benefits."  (Id. at 25.)

As mentioned previously, for this Court to conclude that a plaintiff's situation merits waiver of the exhaustion requirement, a plaintiff must make a "clear and positive showing of futility" as demonstrated through the showing of the five factor test established in Berger.  Harrow, 279 F.3d at 249; see Berger, 911 F.2d at 916-17. In addition, the Third Circuit in Harrow held that, exhaustion is not excused when "correspondence with an employer did not amount to an 'unambiguous application

22

for benefits and a formal or informal administrative decision
denying benefits....”  Id.

Weighing the relevant factors, this Court finds that
plaintiff has failed to make such a showing or raise a genuine
issue of material fact as to any fact as to make summary judgment
inappropriate.  First, Plaintiff cannot state that she diligently
pursued administrative relief prior to filing suit because she
made no efforts to comply with the Plans’ internal grievance
policy.  For example, Plaintiff never followed up on Defendants’
letter informing her she was ineligible for benefits by
requesting review from the LNC Benefits Appeal and Operations
Committee.  Indeed, with respect to the other factors, Plaintiff
merely makes conclusory statements unsupported by evidence that
exhausting her administrative remedies would be futile.  For
example, Plaintiff offers no evidence that Defendants failed to
comply with their own internal administrative procedure other
than arguing that Defendants failed to (1) respond to all her
requests for information and (2) provide proper reasons for its
initial denial of severance benefits.[9]  The evidence is to the

---

[9]  By Defendants’ internal administrative procedures, the
Court assumes that Plaintiff refers to the requirements in the
“Denial of a claim for benefits” section of the Severance and
Retirement Plans that require Defendants to provide a claimant
whose claims have been rejected with (1) written notification
explaining the specific reason(s) for the denial and (2) that, if
the claim is denied, the claimant is entitled to “review
pertinent documents used in the claim determination.”  (Pendleton
Aff. Ex. D and E.)

contrary.  In letters from Philip Johnson (undated) and Strunk
(dated October 15, 2002), Defendants provided Plaintiff with both
the documents she requested and explained to her why her requests
for benefits under the Plans were denied.[10]  Thus, Plaintiff has
not presented sufficient evidence tending to show that Defendants
failed to comply with the Plans' own internal administrative
procedures.  Moreover, Plaintiff presents no evidence other than
her bald allegation regarding the existence of a fixed policy
denying benefits and has presented no testimony of the Plans'
administrators that any administrative appeal was futile.
Without any evidence suggesting the existence of a fixed policy
or testimony from a plan administrator that administrative
appeals were futile, this Court finds that Plaintiff has not
demonstrated that a genuine issue of material fact exists.

   **B.  <u>Plaintiff's Breach of Contract Claim</u>**

   In their motion papers, Defendants argue that Plaintiff's
breach of contract claim should be dismissed because Plaintiff
never had an employment contract with Defendants.  According to
Defendants, the Letter of Agreement between Plaintiff, Byrne, and
Beverly Mitchell is not "sufficiently specific or definite to

---

      [10] It is true that Defendants never provided Plaintiff with
an account balance of her 401k.  However, even if true, this
failure alone is insufficient for this Court to conclude that
Defendants did not comply with their own internal administrative
procedures.  Moreover, failure to provide the account information
would itself be subject to the administrative grievance
requirements of the Plan, which have not been met.

constitute an employment contract" because the agreement does not contain the terms and conditions of Plaintiff's employment including her hourly pay rate or job duties.  Moreover, the Letter of Agreement did not contain any promises of a duration or conditions related to Defendants' right to terminate Plaintiff. (Id. at 16.)

Plaintiff argues that she understood the Letter of Agreement to be an employment contact.  (Pl.'s Opp. Br. at 27.)  Because she was "not a new hire and her salary had already been determined," Plaintiff argues that it was not an essential element of her employment contract at the time.  (Id. at 27.) Plaintiff argues that the Letter of Agreement was an agreement on essential terms manifesting an intent to be bound and that there is, therefore, an enforceable contract.  (Sultan Aff. ¶ 3-4.)

In New Jersey, an employer may fire an employee for good reason, bad reason or no reason at all under the employer-at-will doctrine.  See English v. College of Medicine & Dentistry, 73 N.J. 20, 23 (1977)(the only limitations an employee has upon the right to discharge an employee are contractual, statutory and constitutionally protected interests).  An employment relationship "remains terminable at the will of either an employer or employee, unless an agreement exists that provides otherwise."  Witkowski v. Thomas J. Lipton, Inc., 136 N.J. 385, 398 (1994)(citing Bernard v. IMI Sys. Inc., 131 N.J. 91, 105-06

(1993)).[11]   While the presumption is employment-at-will, <u>see</u>
<u>Woolley v. Hoffman-La Roche, Inc.</u>, 99 N.J. 284 (1985), the
employer and employee "are free to contract for terms and
conditions of employment, such as terminate only 'for cause.'"
<u>Witkowski</u>, 136 N.J. at 398 (internal citations omitted).  Indeed,
under New Jersey law, an employee is presumed to be an employee-
at-will "unless specifically stated in <u>explicit</u>, <u>contractual</u>
<u>terms</u>."  <u>Bernard</u>, 136 N.J. at 105-06 (emphasis added).

    Given the state of the law in New Jersey, this Court need
not address the parties' arguments regarding whether the Letter
of Agreement is an employment contract in order to conclude that
summary judgment is appropriate on Plaintiff's breach of contract
claim.  Even if the Court concluded that the Letter of Agreement
was an enforceable employment contract - a finding necessary for
Plaintiff to maintain its breach of contract claim - the Court
would conclude that nothing in the Letter of Agreement alters
Plaintiff's status as an at-will employee.[12]  The Letter of

---

    [11]   "The employment-at-will doctrine does have exceptions"
including that an employee cannot be fired for a discriminatory
reason or in violation fo a clear mandate of public policy.  <u>Id</u>.;
<u>see</u> <u>also</u> <u>Pierce v. Ortho Pharm. Corp.</u>, 84 N.J. 58, 73 (1980).

    [12]   Prior to signing the Letter of Agreement, Plaintiff was
an at-will employee.  Defendants' employee handbook  provides
that Plaintiff's employment is an employment-at-will. (Def.'s
Statement ¶ 28.)  Specifically, Defendants' "Lincoln Financial
Advisors/Sagemark Consulting Associate Handbook" provides that
"[s]ince an associate's employment is for no fixed period of
time, it may be terminated by the associate or the company at any
time."  (Pendleton Aff., Ex. B.)  Plaintiff testified that, when

Agreement does not mention a duration of Plaintiff's employment (such as a term of years) and does not set out specific criteria regarding Plaintiff's protection from termination (such as a provision stating that Plaintiff can only be terminated "for cause.") Plaintiff admits having a role in the negotiating and drafting of the document and could certainly have insisted on the Letter of Agreement stating some sort of protection from termination at-will. Thus, under the terms of the Letter Agreement, this Court finds that Plaintiff has not overcome the presumption (established in <u>Woolley</u>) that her employment status is anything other than at-will. Moreover, Plaintiff cannot point to any provision of the Letter of Agreement that state in "explicit, contractual terms" that Plaintiff can only be terminated for just cause. Defendant is entitled to judgment upon Plaintiff's contract claim as a matter of law.

### C.  **Plaintiff's NJLAD Claim**

In Count II of the Complaint, Plaintiff claims that she was improperly terminated because her supervisor became aware that she had contracted hepatitis C, an illness that constitutes a handicap under N.J.S.A. 10:5-4.1. (Compl. ¶ 11.) Plaintiff alleges that Defendants discriminated against her by firing her because Defendants did not want to pay the short-term disability

---

she was initially hired, she received a copy of this employee handbook. (Sultan Dep. Tr. at 39.)

benefits associated with short-term disability costs and
"repeatedly berated [her] about her handicap."  (Id. ¶13.)

### 1.   Preemption of the NJLAD by ERISA

In their motion papers, Defendants argue that Section 514 of
ERISA preempts the NJLAD because ERISA "supercede[s] any and all
state laws insofar as they may now or hereafter relate to any
employment benefit plan."  29 U.S.C. § 1144(a).[13]  The United
States Supreme Court has articulated that, in the context of
ERISA, the test for preemption is (1) that the plan is an ERISA
plan and (2) if so, do the plaintiff's claims "relate to" the
ERISA plan.  See Ingersoll-Rand Co. v. McLendon, 498 U.S. 133,
139-40 (1990).  Here, the parties do not dispute that Defendants'
short-term disability plan is an ERISA plan.[14]  Rather, the
dispute centers on whether Plaintiff's LAD claim "relates to" the
short-term disability plan, and therefore, is preempted.

_____

[13]  29 U.S.C. § 1144(a) states, in pertinent part:

 Except as provided in subsection (b) of this section,
the provisions of this subchapter...shall supercede any
and all State laws insofar as they may now or hereafter
relate to any employee benefit plan described in
section 1003(a) of this title....

[14]  The short-term disability plan is an employer funded
plan that was established to protect employees against loss of
income in the event they are unable to work due to illness or
accident. (See Pendleton Aff., Ex. F.)  As such, the plan
satisfies that criteria of an "employee welfare benefit plan"
under ERISA.  See 29 U.S.C. § 1002(1).

According to Defendants, Plaintiff's claim is based on her allegations that she was terminated solely because her supervisor, Byrne, wanted to avoid the cost of providing her with future benefits under the STD Plan.  As such, it relates to the employee benefit plan.  (Def.'s Br. at 18-19.)  In support of their position, Defendants cite Wood v. Prudential Ins. Co. of Am., 207 F.3d 674 (3d Cir. 2000).  In Wood, the plaintiff brought claims under the NJLAD alleging that his employer discriminated against him when it terminated his employment in order to avoid paying benefits due under the employer's health and retirement plans.  Id. at 666-67.  The Third Circuit, holding that plaintiff's claim was preempted by Section 502(a) of ERISA, reasoned that preemption was appropriate because Plaintiff's NJLAD claim was based on a "'benefits-defeating' motive."  Id. at 667 (the employer's action in terminating plaintiff was done solely  to avoid paying plaintiff retirement and health benefits.)  Defendants argue that, after taking Plaintiff's deposition in August of 2005, it became clear that Plaintiff's NJLAD claim alleges that Byrne's sole motivation for terminating Plaintiff was to avoid paying eventual short-term disability claims associated with her hepatitis C - a "benefits-defeating motive."  (Def.'s Br. at 19.)

In opposition, Plaintiff argues first that, by failing to raise a preemption affirmative defense in its Answer (and raising

it for the first time in its summary judgment motion), Defendants have waived their claim that ERISA preempts Plaintiff's NJLAD state claim.  (<u>Id</u>. at 33-34.)  Second, if Defendants have not waived this defense, Plaintiff argues that her NJLAD claims are based more on Defendants' overall reaction to learning that she had hepatitis C.  (Pl.'s Opp. Br. at 34-35.)  More than solely attempting to avoid future short-term disability benefits payments, Plaintiff alleges that Byrne terminated Plaintiff for "health and work issues" including the side effects of her disease, treatment and associated costs to Byrne and the fact that Plaintiff would likely miss work when seeking treatment. (<u>Id</u>.; Sultan Aff. ¶ 6.)

   a.   **Waiver of affirmative defense of preemption**

First, this Court must address whether Defendants' failure to raise the affirmative defense of preemption of Plaintiff's NJLAD claim under ERISA in its Answer results in Defendants waiving their right to assert this affirmative defense.  In general, "[a]n affirmative defense which is neither pleaded as required by Rule 8(c) nor made the subject of an appropriate motion under Rule 12(b) is waived."  <u>Systems, Inc. v. Bridge Electronics Co.</u>, 335 F.2d 465, 466 (3d Cir. 1964).  An ERISA preemption defense is widely recognized as a waivable affirmative defense.  See Dueringer v. General Am. Life Ins. Co., 842 F.2d 127, 130 (5th Cir. 1988) (holding that ERISA preemption

30

affirmative defense is waivable); Gilchrist v. Jim Slemons
Imports, Inc., 803 F.2d 1488, 1497 (9th Cir. 1986) (same);
Rehabilitation Inst. v. Equitable Life Assurance Soc., 131 F.R.D.
99, 101 (W.D. Pa. 1990).

    Courts in this Circuit, however, have taken a more forgiving
approach to parties who fail to raise affirmative defenses in an
answer, as courts have held that the failure to raise an
affirmative defense by responsive pleading or appropriate motion
does not always result in waiver.  See Prinz v. Great Bay Casino
Corp., 705 F.2d 692 (3d Cir. 1983).  Indeed, the Third Circuit
has allowed parties to claim affirmative defenses, not raised
earlier, in later stages of litigation.  See Charpentier v.
Godsil, 937 F.2d 859, 864 (3d Cir. 1991); Kleinknecht v.
Gettysburg College, 989 F.2d 1360 (3d Cir. 1991)  Specifically,
the Charpentier court held that:

> Under Fed R. Civ. P. 15(a), a responsive pleading may
> be amended at any time by leave of court to include an
> affirmative defense, and "leave shall be freely given
> when justice so requires." Unless the opposing party
> will be prejudiced, leave to amend should generally be
> allowed. Moreover, under Fed R. Civ. P. 15(a), issues
> tried by the express or implied consent of the parties
> are "treated in all respects as if they had been raised
> in the pleadings." It has been held that a "defendant
> does not waive an affirmative defense if 'he raised the
> issue at a pragmatically sufficient time, and [the
> plaintiff] was not prejudiced in its ability to
> respond.'"

Charpentier, 937 F.2d at 863-64 (quoting Fed. R. Civ. P. 15(a)).
Indeed, in Kleinknecht, the Third Circuit held that an immunity

defense, raised for the first time at summary judgment, was not waived by defendant when "the issue presents only a question of law for resolution" and deemed it "inappropriate" to decide "immunity issues on the basis of waiver." Kleinknecht, 989 F.2d at 1374.

This Court will follow the logic set out in the Third Circuit's decision in Charpentier and Kleinknecht in finding it inappropriate to decide an issue of Federal preemption on the basis of waiver.  Defendants state that, because of Plaintiff's testimony in her deposition, Defendants learned that Plaintiff's NJLAD claim was based solely on Plaintiff's belief that she was terminated solely because of Byrne's "benefits-defeating" motive (to avoid paying for short-term disability) and raised the defense soon after, in a motion for summary judgment filed a little over a month after the deposition. (Def.'s Reply Br. at 6-8.)  Thus, the Court finds that Defendants' raising the affirmative defense of preemption at the summary judgment stage in this case, while certainly not the most appropriate manner to raise such a defense, was made "at a pragmatically sufficient time" as Defendants had just learned that Plaintiff's NJLAD claim was based solely on a "benefits-defeating" motive.  See Charpentier, 937 F.2d at 864.[15]  As such, the Court will grant

_____

[15]  Ideally, Defendants should have filed a motion for leave to amend their answer under Fed. R. Civ. P. 15(a).  Moreover, because of the lateness of Defendants' answer, this Court is

Defendants' leave to amend its Answer to include this affirmative
defense.

### b. "Benefits-defeating" motive

Having found that Defendants have not waived this defense
and allowing Defendants to amend their Answer, the Court next
must address whether the NJLAD claims "relate to" an employee
benefit plan covered by ERISA.  See Ingersoll-Rand Co., 498 U.S.
at 139-40 (ERISA preempts state law tort and contract claims
dealing with wrongful termination in order to avoid paying
employees benefits under a plan covered by ERISA);  see also
Yekel v. General Biscuit Brands, Inc., 1991 U.S. Dist. LEXIS 3641
*8-9 (1991).  Indeed, a number of courts, including Wood in the
Third Circuit and Altson v. Atlantic Electric Co. in this
District have held that NJLAD claims are preempted by ERISA
because the NJLAD claim is related to a benefits plan.  See
Altson v. Atlantic Electric Co., 962 F. Supp. 616, 624-25 (D.N.J.
1997); Yekel, 1991 U.S. Dist. LEXIS, at *9.

Here, this Court finds that Plaintiff's NJLAD claim should
be preempted by ERISA as it is clear that Plaintiff's claim under
NJLAD relates to the STD Plan.  Plaintiff's NJLAD claim alleges
that the sole reasons she was terminated was Byrne's desire to
avoid paying short-term disability payments associated with

_____

amenable to Plaintiff filing a motion for leave to amend in
response to Defendants' amended answer.

Plaintiff's illness.  Plaintiff specifically states in her
Complaint that Byrne "constantly questioned [her] about her
handicap, complained about any short and long term disability
costs to the employer and repeatedly berated plaintiff about her
handicap."  (Compl. ¶ 13.)(emphasis added).  Plaintiff's
deposition testimony clarifies her NJLAD claim as she stated that
Byrne was not worried about health risks to himself or his co-
workers (i.e., the communicability of hepatitis C) or other
issues associated with Plaintiff's disease.  (Sultan Dep. Tr. at
209.)  When asked at her deposition about Byrne's motivation for
terminating Plaintiff, Plaintiff did not mention that Byrne was
concerned that Plaintiff would miss work days for treatment or a
risk of a decreased work performance on the part of Plaintiff.
Instead, it is telling that Plaintiff testified only that Byrne
"was worried about having to pay disability" because such costs
would "come from his own pocket."  (Id.)

     Thus, this Court concludes that Plaintiff's allegation of a
violation of the NJLAD is based solely on allegations that Byrne
terminated her to avoid paying short-term disability benefits
under the STD plan.  Because her allegations are that the sole
motivating purpose for her termination was to avoid paying
benefits, the current NJLAD claim falls within ERISA Section
502(a) and is thus preempted.  See 29 U.S.C. § 1144(a).  Should
Plaintiff wish to amend her claim, as mentioned in her brief in

opposition, she must file a motion to amend the Complaint and pursue her claim through ERISA's enforcement provision, see 29 U.S.C. § 1132, or as a non-preempted amended claim under NJLAD.[16]

> **c.   Whether Plaintiff has presented a prima facie case of Defendants' violation of the NJLAD**

Because this Court has held that Plaintiff's claim under the NJLAD is solely a claim for termination to avoid payment of benefits under an ERISA plan and thus is preempted by ERISA and should have been brought under ERISA's enforcement provision - Section 510 of ERISA - this Court need not address Defendants' argument that Plaintiff has failed to present a prima facie violation of the NJLAD.  See 29 U.S.C. § 1132, 1140 (prohibiting the discharge of a participant or beneficiary for the purpose of interfering with the attainment of any right to which such participant may be entitled.)

## IV. CONCLUSION

This Court will grant Defendants' motion for summary judgment on all counts.  Because Plaintiff failed to exhaust (or even participate in) Defendants' internal grievance and appeals process for denied claims, Plaintiff cannot maintain this action under 29 U.S.C. § 1132(a) with respect to either Defendants' Retirement Plan or Severance Plan.  Likewise, Plaintiff also cannot maintain her claim of breach of contract because, even if

---

[16]  Because Plaintiff's counsel has not articulated the contours of such a proposed claim under ERISA or under the NJLAD, this Court does not address whether any such amendment would be futile under Rule 15(a), Fed. R. Civ. P.

the Letter of Agreement between Plaintiff, Byrne and Beverly
Mitchell was an employment contract (and not simply a schedule
arrangement as argued by Defendants), the Letter of Agreement
contains no language related to the term of Plaintiff's
employment, the grounds upon with Plaintiff can be terminated or
in any way alter Plaintiff's status as an at-will employee.  With
no language in the contract to the contrary, Plaintiff has failed
to overcome the presumption under New Jersey law that she is an
at-will employee and can be terminated for no reason or any
reason.  Finally, this Court holds that Plaintiff's current claim
under the NJLAD is solely a claim that she was terminated to
avoid payment of benefits under an ERISA plan and it is therefore
preempted by ERISA and must be dismissed.  In connection with
this, Defendants will be granted leave to amend their Answer to
add this affirmative defense, and the Answer is deemed amended.
Because this Court dismisses all pending claims, it need not
address Defendants' argument that, under ERISA, Plaintiff (1) is
not entitled to a jury trial and (2) not entitled to pursue
extracontractual and punitive damages.  The accompanying Order
will be entered dismissing the Complaint without prejudice to
Plaintiff's right to seek to amend her Complaint within thirty
(30) days of the entry of this Opinion and Order.


**June 30, 2006**        **s/ Jerome B. Simandle**
Date                 JEROME B. SIMANDLE
                 United States District Judge